IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NOEL PADILLA, et al.,                )
                                     )
                Plaintiffs,          )
                                     )
        v.                           )      No.  06 C 5462
                                     )
CITY OF CHICAGO, et al.,             )
                                     )
                Defendants.          )

### MEMORANDUM OPINION AND ORDER

This action has been brought by Noel Padilla ("Noel"), Socorro Padilla ("Socorro"), Lourdes Padilla ("Lourdes"), Irene Santiago ("Santiago") and Erling Johnson ("Johnson") (collectively "Plaintiffs") against five individual officers of the Chicago Police Department--Keith Herrera, Steve Del Bosque, Margaret Hopkins, Paul Zogg and Donovan Markiewicz (each referred to here by his or her last name and all collectively referred to as "Defendant Officers")--as well as against the City of Chicago.[1] Plaintiffs assert that Defendant Officers are liable under 42 U.S.C. §1983 ("Section 1983") for claimed constitutional

---

[1] Against the City of Chicago, Plaintiffs sought recovery under several different theories: Monell-type liability, respondeat superior principles and liability under the Local Government and Governmental Employees Tort Immunity Act," 75 ILCS 10/9-102). Plaintiffs moved for summary judgment on the respondeat superior and Tort Immunity Act theories, and the City of Chicago moved for summary judgment on the Monell-type theory. Since those filings, however, this Court has entered the City's certification of indemnification (Dkt. No.564) and Monell certification (Dkt. No.582), and those entries render Plaintiffs' claims against the City and the attendant motions for summary judgment moot.

violations: (1) the false arrest of Noel, (2) the false imprisonment of Noel, (3) the violation of Noel's due process rights, (4) the unlawful search of Johnson's and Santiago's home and (5) the unlawful search of Socorro's and Lourdes' home. Noel has also brought a state-law claim of malicious prosecution against Defendant Officers, and all Plaintiffs have asserted a state-law claim of intentional infliction of emotional distress.[2]

All parties except Herrera have filed cross-motions for summary judgment under Fed. R. Civ. P. ("Rule") 56. Plaintiffs have moved for partial summary judgment on Noel's claims for false arrest, violation of due process rights and malicious prosecution and on Socorro's and Lourdes' unlawful search claim. Zogg, Hopkins, Markiewicz and Del Bosque (collectively referred to for this purpose as "Unnamed Officers") have moved for summary judgment on Noel's false imprisonment claim, both unlawful search claims and Plaintiffs' collective intentional infliction of emotional distress claim. Unnamed Officers also claim immunity from all of Plaintiffs' claims under the doctrine of qualified immunity. This Court turns now to those motions.

### Standard of Review

Every Rule 56 movant bears the burden of establishing the

---

[2] Plaintiffs' Complaint also includes a claim under RICO (18 U.S.C. §1961), but Plaintiffs have since dropped that claim. Plaintiffs have also dropped Noel's Section 1983 excessive force claim.

absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (<u>Wheeler v. Lawson</u>, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (<u>id</u>.). Evidence submitted for summary judgment purposes "need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content" (<u>Hardrick v. City of Bolingbrook</u>, 522 F.3d 758, 761 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

What follows is a summary of the facts, viewed of course in the light most favorable to the nonmovants--a requirement applied within any limitations created by the extent of their compliance (or noncompliance) with the strictures of this District Court's LR 56.1, adopted to implement Rule 56.[3] One more complexity is

---

[3] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. Except for some minor factual

added where, as here, cross-motions for summary judgment are involved.  Those same principles require the adoption of a dual perspective that this Court has sometimes referred to as Janus-like:  As to each motion the nonmovant's version of any disputed facts must be credited.

## Background[4]

On the morning of October 15, 2005 Noel was visiting his friend Raymond Alvarado ("Alvarado") at Alvarado's home (P. St. ¶25).  Around 9 a.m. the two smoked a cigar containing cannabis on Alvarado's front porch (Z. St. ¶17), and at some point between 9 a.m. and 10 a.m. Noel left Alvarado's house to make a phone

---

statements of their own, Markiewicz, Del Bosque and Hopkins rely on Zogg's LR 56.1 materials.  Herrera, however, has filed his own LR 56.1 response to Plaintiffs' LR 56.1 statement.  This opinion cites to plaintiffs' LR 56.1 statement as "P. St. ¶--," to Zogg's response as "Z. Resp. ¶--" and to Herrera's response as "H. Resp. ¶--."  Zogg's counterstatement is cited "Z. St. ¶--," Plaintiffs' response to that counterstatement is cited "P. Resp. ¶--" and Zogg's reply is cited "Z. Reply ¶--."  Del Bosque's counterstatement is cited as "D. St. ¶--."  Citations to exhibits attached to those documents will add "Ex. --" to the appropriate document designation.  Where a party does not dispute the adversary's original statement, or where a party's challenge to an asserted fact is lacking in legal or evidentiary support, this opinion cites only that original statement.

[4]  Both Plaintiffs and Defendant Officers include innumerable--and almost never useful--"motions to strike" in their LR 56.1 materials, charging irrelevancy and lack of evidentiary support.  With the exception of two questions of admissibility discussed below, this Court will not consider those myriad "motions."  Instead the evidence tendered will be evaluated in terms of the standards set out in the text, with submissions that fail to meet those standards or that prove themselves to be irrelevant simply not being credited, rather than being "stricken."

call at a nearby bar (Vicky's) regarding an apartment Noel was hoping to rent (P. Resp. ¶18). After placing the call Noel walked back to Alvarado's house, carrying only his wallet with a state ID and, depending on which party you ask, either $1,240 (Z. St. ¶59) or over $2,000 (P. St. ¶28). Either way the money was to be used as a deposit for the apartment he was interested in renting (P. St. ¶28).

As Noel was approaching Alvarado's house, two police cars approached him, one a marked squad car and the other a gold-tan unmarked vehicle (Z. St. ¶19). Three officers occupied the unmarked vehicle (Z. St. ¶20), and the marked car was occupied by two (Z. St. ¶27). Police records reflect that on the day of Noel's arrest Herrera, Del Bosque and Markiewicz were working together in one car and Zogg and Hopkins were working together in another (P. St. Ex. 1). As Noel walked up to Alvarado's house, one of the three officers occupying the gold-tan vehicle--an officer Noel describes as having appeared to be Asian--called out "hey you" and "come here" (P. St. ¶32). Noel was approached by the officer and asked if he could show his identification (id.). Noel remained on Alvarado's porch but reached to give the officer his wallet, at which point the officer grabbed Noel's wrist, pulled him down the stairs and placed him in handcuffs (P. St. ¶33). Noel was then placed in the unmarked police car (Z. St. ¶26). Noel describes two of the other officers that were on the

5

scene as partners--one a female and the other a white male (P.
St. ¶¶7, 37). He describes the remaining two officers as a
Hispanic officer, known to Noel as Officer Herrera, and an older
white officer, approximately 40 years of age (P. St. ¶6).

After securing Noel in one of the police cars, Herrera, the
older officer and the female officer's partner approached
Alvarado's front door and knocked (P. St. ¶37). When Alvarado
answered he was handcuffed by the officers, and they proceeded to
search his home (P. St. ¶¶37-38). When Vanessa Moriera--another
occupant of Alvarado's house--returned home, the female officer
on the scene stopped her, questioned her and searched her on the
porch (P. St. ¶39). Alvarado was eventually placed into the
marked squad car (id. ¶41). In the meantime Noel asked an
unspecified officer whether the police would let him go, and he
was told that if a background check cleared he would be released
(id. ¶42).

Once the search of Alvarado's home was complete, Noel and
Alvarado were driven to an alley by their arresting officers (id.
¶¶43, 45). While handcuffed in the police car, Noel was
interrogated by the three officers riding with him (id. ¶47). He
was told that if he did not "tell [them] something," "give [them]
something" or indicate the source of drugs that were allegedly
found by the police, then he was "going to go for a long time"
(H. Resp. ¶48).

6

After questioning Noel in the alley, the officers decided to drive to 4305 North Francisco Avenue--the address where Noel lived with his girlfriend Irene Santiago ("Santiago"), their infant son Julian and Santiago's grandfather Erling Johnson ("Johnson")(Z. St. ¶30). On the way Herrera told Noel that if the police did not find evidence of wrongdoing at that address Noel would be released (P. St. ¶51). Once the police arrive at the Francisco residence, Herrera and the officer described as appearing Asian left the unmarked police car while the older officer stayed with Noel (P. St. ¶55). They approached the Francisco residence, and the officers knocked on the door (Z. Resp. ¶56; H. Resp. ¶56). Johnson answered, and when the officers asked Johnson if they could enter his residence, he said yes (P. Resp. ¶33).

Despite Johnson's consent the officers did not enter at that point (P. Resp. ¶33). Instead Johnson called for Santiago, and Santiago came to the door to speak with the officers (P. Resp. ¶34). Santiago was asked whether Noel lived with her (she said yes) (P. Resp. ¶36), and she was told that if she could show the officers some of Noel's belongings he would be released (Z. Resp. ¶55; H. Resp. ¶55). As a third officer approached the door, the first two officers entered the Francisco residence (P. Resp. ¶37). Herrera conducted a search of the residence while the other officer spoke with Johnson in the kitchen (Z. St. ¶¶35, 38-

41). When Herrera asked Santiago where Noel slept, she pointed to the bedroom (P. Resp. ¶40). Herrera then entered the bedroom and began to search (Z. Reply ¶40). As he was about to turn on the light Santiago told him that her son was sleeping in the crib, at which point Herrera left the bedroom (id.). Shortly thereafter the officers left (Z. St. ¶41). At no point did Johnson or Santiago tell the officers to leave (Z. St. ¶42).

Defendant Officers next visited the house located at the address on Noel's identification card, where Noel's sister (Lourdes) and mother (Socorro) lived (P. St. ¶59). When the officers arrived at the West 35th Street home--Noel and Alvarado still in tow--three male officers approached the residence. Noel describes the three officers who entered the apartment building as Herrera, the Asian-appearing officer and the partner of the female officer (P. St. ¶62), while Socorro describes the officers as three white males (P. Resp. ¶47). Upon hearing the three officers knock, Socorro answered the door. She was asked whether Noel lived with her and whether his clothes were there, and she answered in the negative (Z. Reply ¶45). One of the officers then told Socorro that they were going to look for Noel's clothing (P. Resp. ¶46), and they entered the residence without a warrant (H. Resp. ¶63; Z Resp. ¶63). Socorro did not tell the officers that they could enter (P. St. ¶63), nor did she tell them they could not enter (P. Resp. ¶48).

8

Once inside the Padillas' residence the officers began
searching the Padillas' living room, hallway closet and kitchen
(P. St. ¶64).  As they began searching, Noel's sister Lourdes
came out of the bathroom and repeatedly asked the officers why
they were there and what they were looking for (P. St. ¶65).
There is debate as to whether Lourdes asked the officers to stop
as they continued their search of the residence (P. St. ¶65; Z.
St. ¶52; H. Resp. ¶65), but the parties agree that Lourdes asked
the officers to stop their search before they reached the
bedroom, and the officers complied with that request (P. Resp.
¶53).

From the Padillas' West 35th residence the officers took
Noel and Alvarado to a police station, where they were processed
and charged--Noel with delivering cocaine and Alvarado with
possessing cocaine (P. St. Exs. 8, 10).  Herrera and Zogg
inventoried $1,240 from Noel (H. Resp. ¶73; Z. Resp. ¶73), but
Noel claims that the police actually took around $2,000 from him
(P. St. ¶72).[5]  Herrera, Del Bosque and Zogg each filled out
police reports stating that Noel delivered cocaine (P. St.¶76).
Herrera eventually signed a criminal complaint against Noel,
which initiated criminal proceedings (H. Resp. ¶79).  Noel's bail

---

[5]  In an effort to disprove that assertion, Herrera points
to the fact that Noel told his former attorney that he had around
$1,200 on him when he was arrested (H. Resp. ¶72).  Further, in
listing damages for this case, Plaintiffs stated that Noel's
monetary loss was around $1,250 (id.).

was set at $150,000, and because he could not afford that bail he remained in jail from October 15, 2005 through July 19, 2006 (P. St. ¶¶80-81).

Beginning in 2005--the same year in which Noel was arrested--Anna Demacopoulos ("Demacopoulos," now a Cook County Circuit Court Judge but then a Cook County prosecutor) served as the supervisor of the Special Prosecutions unit in the Narcotics Bureau of the Cook County State's Attorney's Office (P. St. ¶86). In that role Demacopoulos helped bring criminal charges for official misconduct against certain Chicago Police officers in the Special Operations Section ("SOS") (Z. Resp. ¶87; H. Resp. ¶87)--the unit to which each defendant belonged at the time of Noel's arrest (P. St. ¶¶6-7). Demacopoulos also had the authority to dismiss or nolle prosequi narcotics cases in which officers under investigation were set to testify (P. St. ¶89). As it turns out, Noel's case fell into that category (P. St. ¶¶93, 109).

Noel's criminal trial was supposed to take place on July 17, 2006 (Z. Resp. ¶91; H. Resp. ¶91). But before the trial began Demacopoulos approached Noel's attorney and explained that the officers set to testify against Noel were under investigation, that she did not want them to testify and that she would not object to Noel being released on his own recognizance (P. St. ¶¶93-98). Demacopoulos explained the situation to Noel's judge,

10

and Noel was in fact released (P. St. ¶99). Several officers,
including those that were going to testify against Noel, were
eventually indicted for official misconduct (P. St. ¶¶100-102).
Demacopoulos believed Del Bosque and Herrera to be the only two
witnesses to Noel's alleged crime, and because they were both
under investigation or indictment and thus could not testify, the
State's Attorney's Office moved to have Noel's case dismissed
through nolle prosequi order (P. St. ¶¶105-10). That motion was
granted, and Noel's case was dismissed on September 15, 2006 (P.
St. ¶110).

Noel claims that he experienced panic attacks and constant
rushes while in jail (P. St. ¶113). He also reports that he had
feelings of anxiety, depression, helplessness, frustration,
impatience and sadness as a result of his incarceration (P. St.
¶¶113-14). He wrote more than one letter to his attorney
expressing his dismay, explaining that he was "suffer[ing]
mentally" (P. St. ¶116). Noel also claims to have suffered panic
attacks even after he was released from jail (P. St. ¶117), and
he says that he felt the effects of his emotional trauma for
several years (P. St. ¶119). Defendant Officers, however, point
out that Noel has not seen a medical professional for his
injuries, nor has he supplied any documentation to corroborate
his claims of emotional distress (Z. St. ¶69).

11

## Global Issues

There are several issues in dispute that bear upon many if not all of the claims being considered for summary judgment. Thus, before turning to the claims themselves, this opinion will resolve the parties' disputes about those global issues.

### Admissibility of Evidence

Pursuant to Rule 56(c)(2) evidence must be admissible in order to support or to defend against a motion for summary judgment. Each side challenges the admissibility of certain evidence proffered by the other.

Plaintiffs' LR 56.1 statement discusses evidence of indictments entered against--and eventual guilty pleas entered by--four of the five Defendant Officers (all but Zogg)(P. St. ¶¶11-14). Underlying those indictments and pleas are actions very similar to what has been alleged in this case, including illegal arrests and searches, falsifying police reports and, in some cases, providing false testimony to grand juries and stealing money while on duty (P. St. ¶¶11-14). Plaintiffs also point out that a handful of other SOS officers have pleaded guilty to similar charges, including the fabrication of evidence (P. St. ¶¶15-18).

Fed. R. Evid. 404(b) prohibits the use of bad-acts evidence to suggest that a defendant has the propensity to act in accordance with his or her prior misdeeds. Plaintiffs admit that

12

the evidence at issue cannot be used to show Defendant Officers'
propensity to act a certain way, but they provide four
alternative predicates for the use of the evidence.

Plaintiffs' first three theories of admissibility fall flat.
Plaintiffs' first theory relies on the evidence's utility as to
Noel's <u>Brady</u> claim, but later analysis in this opinion explains
that Plaintiffs' <u>Brady</u> claim is not viable for unrelated reasons,
so that the evidence of certain officers' prior bad acts is not
needed to resolve that issue.

Next Plaintiffs argue that the guilty pleas should be
considered because they are party admissions about lying and
committing misconduct.  That theory could classify that evidence
as nonhearsay under Fed. R. Evid. 801(d)(2), but it is unrelated
to Fed. R. Evid. 404(b) analysis.  Plaintiffs' third contention
is that the evidence of Defendant Officers' guilty pleas
establishes their modus operandi.  It is true that prior-act
evidence can be admissible to show modus operandi if that
evidence "bears a singular strong resemblance to the pattern of
the offense charged, with the similarities between the two
sufficiently idiosyncratic to permit an inference of pattern"
(<u>United States v. Simpson</u>, 479 F.3d 492, 498 (7th Cir.
2007)(internal quotation marks omitted), but it must still be
used to prove something other than character, such as the
identity of the person who committed an act at issue (see, e.g.,

13

United States v. Beasley, 809 F.2d 1273, 1278 (7th Cir. 1987)).
Here Plaintiffs' LR 56.1 statement avers that a host of other SOS
officers committed the same type of transgressions, undercutting
any argument that the acts were idiosyncratic in the sense called
for by Simpson to the degree necessary to confirm identity.  So
that theory also fails.

     Finally Plaintiffs contend that the bad-acts evidence at
issue is necessary to show that Noel's criminal case was
dismissed for reasons indicative of innocence, which is in turn
necessary for Plaintiffs to succeed on their malicious
prosecution claim.  For reasons explained in the malicious
prosecution section of this opinion, the reason that certain
Defendant Officers were prevented from testifying (the fact of
their indictments) is highly relevant to--and indeed wholly
necessary for--Noel's malicious prosecution claim.  Then
prosecutor Demacopoulos has confirmed that Noel's criminal case
was dismissed because the only purported witnesses to his alleged
crime were under indictment for crimes similar to those alleged
by Noel and, accordingly, were prevented from testifying.  That
suffices to bring evidence of Defendant Officers' guilty pleas
into the case.

     Next Plaintiffs seek to exclude certain statements found in
police reports put forth by Defendant Officers.  Those reports
contain statements, made by certain of the Defendant Officers,

that they observed Noel giving Alvarado cocaine in exchange for money (P. St. Exs. 7-11). Plaintiffs concede that, generally, statements made in police reports are admissible under Fed. R. Evid. 803(8), which is a hearsay exception permitting the admission of public records (Bloodworth v. Village of Greendale, 475 Fed. App'x 92, 94 (7th Cir. 2012)). But Fed. R. Evid. 803(8) requires that "neither the source of information nor other circumstances indicate a lack of trustworthiness." As Plaintiffs point out, four of the five officers at the scene of Noel's arrest, and two of the three officers who signed the police reports in question, have pleaded guilty to falsifying police reports (Compare P. St. Ex. 7-9, 11 with P. St. ¶¶11-14).[6] Anyone would be hard-pressed to think of a clearer indication that a police report lacks trustworthiness. In short, the observations contained within Plaintiffs' Exs. 7 through 11 are not admissible to prove their truth.[7]

**Impact of Fifth Amendment Invocation**

At each of their depositions, Defendant Officers repeatedly avoided responding to all questions by calling upon their Fifth

---

[6] Fed. R. Evid. 104(a) permits this Court to consider evidence of limited or no admissibility (such as certain of Defendant Officers' guilty pleas) in ruling on admissibility questions themselves.

[7] Defendant Officers do not challenge Plaintiffs' use of those reports for purposes other than the truth of the observations contained therein, so such use is permissible.

Amendment privilege against self-incrimination. In civil cases, unlike criminal cases, juries are free to draw adverse inferences from a defendant's invocation of that Fifth Amendment privilege (LaSalle Bank v. Seguban, 54 F.3d 387, 389-90 (7th Cir. 1995)--but such an invocation cannot substantiate civil liability on its own (id. at 390-91). Instead a Fifth Amendment invocation must be viewed in light of the other evidence proffered (id.).

There is disagreement between the parties as to whether a negative inference is appropriate in the context of a summary judgment motion. At least one court has decided that giving extra evidentiary weight to a defendant's Fifth Amendment invocation at the summary judgment stage is inconsistent with the requirement that all reasonable inferences be made in the nonmovant's favor (see Stichting Ter Behartiging van de Belangen van Oudaandeelhouders In Het Kapitaal van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 55 (2d Cir.2005)). Another has reached the opposite conclusion, finding a Fifth Amendment negative inference appropriate even when considering a summary judgment motion (see SEC v. Colello, 139 F.3d 674, 677-78 (9th Cir.1998)). Still others have declined to decide the issue (see, e.g., SEC v. Smart, 678 F.3d 850, 858 n. 8 (10th Cir. 2012); In re Marrama, 445 F.3d 518, 522-23 (1st Cir. 2006)).

Before 2008 the Seventh Circuit was rooted firmly in the third category, having decided to avoid the issue until its

disposition was necessary to decide a case (see <u>LaSalle Bank</u>, 54 F.3d at 391 n. 7).  But <u>SEC v. Lyttle</u>, 538 F.3d 601, 604 (7th Cir. 2008)--an opinion reviewing the grant of a summary judgment motion--cited <u>Colello</u> approvingly and explained that evidence of wrongdoing could be "reinforced by the inference...of guilt from [a defendant's] refusal to testify."

    Because courts are required to draw only <u>reasonable</u> inferences in favor of a nonmovant, that conclusion makes sense. It must be remembered that the Fifth Amendment can properly be called upon only when honest answers would tend to subject the answerer to criminal liability (see <u>In re High Fructose Corn Syrup Antitrust Litig.</u>, 295 F.3d 651, 663-64  (7th Cir. 2002)). Hence a defendant seeking to avoid the weight of a negative inference must advance something explaining a reason for his or her Fifth Amendment invocation other than guilty conduct associated with the civil action.  Defendant Officers' Fifth Amendment invocations are in play in that respect.

**Identifying Defendant Officers**

    In connection with all claims, Unnamed Officers challenge Plaintiffs' ability to identify any of the officers and thus to ascribe offensive conduct to each (see D. St. ¶¶8-13).[8]  To

_____

    [8]  That challenge explains this opinion's use of the odd locution "Unnamed Officers," for of course all Defendant Officers are <u>named</u> in this litigation.  Adoption of that term simply seems closer to the scenario here than (say) "Unidentified Officers," for the ensuing analysis shows that this Court is not holding

whatever extent Unnamed Officers challenge Plaintiffs' ability to identify the five Defendant Officers as those present at Noel's arrest, that argument cannot be taken seriously, given the multiple police reports and activity logs confirming the opposite (see P. St. Ex. 1-2, 7-9). Further, Noel repeatedly confirmed that the five officers present at his arrest were also present at the searches that took place (P. St. ¶¶37-39, 45, 55, 62), and there is not a whisper of evidence that any officer other than the Defendant Officers was present at the arrest or the searches.

Unnamed Officers do, however, point to Plaintiffs' collective inability to describe each Unnamed Officer by name (see D. St. ¶¶8-13). Plaintiffs respond by asserting that Noel can identify the actions of each defendant through distinguishing characteristics. Beyond Herrera, whom Noel knew by name at the time of his arrest (see P. St. ¶6), Noel identified the other officers as a female (allegedly Hopkins), the female officer's partner (allegedly Zogg), an "Asian-looking" officer (allegedly Del Bosque) and an "older" officer (allegedly Markiewicz).

No jury could reasonably question Noel's identification of Herrera (because Noel knew him by name) or Hopkins (because she was the only female officer) or Zogg (because he was the only officer that was partnered with Hopkins). Noel's other two identifications, however, could arguably be put into question.

---

here that the officers have not been <u>identified</u>.

18

Noel identified one police officer as "Asian-looking," but the
officer whom Plaintiffs connect to that description is Hispanic
(D. St. ¶19). Noel described the other unidentified officer as
"older," but Plaintiffs fail to state Markiewicz' age and
Markiewicz does not look particularly old in a picture provided
by Plaintiffs (P. St. Ex. 61). Moreover, Noel describes the
"older" officer as 40 years old, and Del Bosque is five years
short of that estimate--he is 35 (P. St. §122). Because Noel has
certainly provided identifications of all Defendant Officers that
a jury <u>could</u> accept, no claim will be dismissed based on a lack
of identification, but the potentially insufficient descriptions
of the officers identified as Del Bosque and Markiewicz must be
kept in mind as Plaintiffs' motion for partial summary judgment
is considered.

## **Qualified Immunity**

In addition to their assertion that they have not violated
any of Plaintiffs' constitutional rights, Unnamed Officers argue
that their qualified immunity forestalls any possible liability.
In determining whether a state actor is immune from suit under
the doctrine of qualified immunity, two questions must be asked
(<u>Jones v. Clark</u>, 630 F.3d 677, 680 (7th Cir. 2011)):

> [F]irst, whether the facts presented, taken in the
> light most favorable to the plaintiff, describe a
> violation of a constitutional right, and second,
> whether the federal right at issue was clearly
> established at the time that the alleged violation
> occurred.

19

Most of Unnamed Officers' qualified immunity argument is a regurgitation of their arguments against the existence of a constitutional violation in the first instance. Their only additional contention rests on the proposition that the constitutional law applicable in this case is clearly established. That of course adds nothing to their defense--quite the contrary. Qualified immunity can be useful to state actors when they may have violated the Constitution but the applicable law on the matter was unclear (Ryan v. Ill. Dep't of Children and Family Servs., 185 F.3d 751, 760 (7th Cir. 1999)). But by admitting that the law applicable to this case was clearly established, Unnamed Officers have effectively conceded the second prong in the qualified immunity calculus. Hence this Court need not engage in any qualified immunity analysis separate from the inquiry as to whether any constitutional violations have occurred.

## Section 1983 Claims

Pursuant to Section 1983 a federal remedy exists against anyone who, under color of state law, deprives a citizen of his or her rights under the United States Constitution (see Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962, 972 (7th Cir. 2012)). As Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983)(emphasis in original) explains:

> Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An

20

> individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional deprivation.

In other words, Plaintiffs must show not only that a constitutional violation occurred, but also which Defendant Officers caused or participated in the deprivation of constitutional rights.  That does not mean, however, that an officer must necessarily be the direct actor in a deprivation to be held personally liable in a Section 1983 action.  Instead a police officer can be held liable for failing to intervene when a citizen's constitutional rights are being violated by another law enforcement official, as long as the observing officer had a realistic opportunity to intervene to prevent the constitutional deprivation (Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)).[9] For instance, an officer may be obligated to call for backup, caution a fellow officer to cease his offending behavior or even arrest an offending officer to prevent a constitutional deprivation (id.).

---

[9]   Defendant Officers argue that Plaintiffs did not plead a "failure-to-intervene" theory.  But this Court has often called the attention of lawyers to the trenchant opinion authored by Judge Easterbrook in NAACP v. Am. Family Mut. Ins., 978 F.2d 287, 292 (7th Cir. 1992) as what it considers the most lucid explanation of the principle that a claim--the operative concept in federal practice--is made up of the congeries of facts that gives rise to liability, so that theories of liability (which are components of a cause of action, the operative concept under state law) need not be pleaded.  Indeed, that and other cases from our Court of Appeals hold that even pleading the wrong theory of liability does not defeat a viable federal claim.

21

**False Arrest**

Plaintiffs' Complaint also alleges that Noel was falsely arrested by Defendant Officers.  Plaintiffs now move for summary judgment on a theory of false arrest under both Section 1983 and Illinois law.[10]  As Plaintiffs observe, the elements of a false arrest claim under Section 1983 are essentially the same as those under Illinois law (compare <u>Fox v. Hayes</u>, 600 F.3d 819, 832 (7th Cir. 2010) with <u>Meerbrey v. Marshall Field & Co.</u>, 139 Ill.2d 455, 474, 564 N.E.2d 1222, 1231 (1990)). Thus, while the preceding analysis has focused on Plaintiffs' Section 1983 claim, it is applicable to Plaintiffs Illinois claim for false arrest as well.

It is black letter constitutional law that a citizen's Fourth Amendment right against unreasonable search or seizure  is violated when he is arrested without probable cause (<u>Fox</u>, 600 F.3d at 832).  Probable cause exists where the police have reasonably trustworthy information that would warrant a prudent person in believing that a crime had been or was being committed by a suspect (<u>Sheik-Abdi v. McClellan</u>, 37 F.3d 1240, 1246 (7th Cir. 1994)).  In making the probable cause determination, this Court must look only to what the Defendant Officers knew at the time of the arrest (<u>Kelley v. Myler</u>, 149 F.3d 641, 646 (7th Cir.

---

[10]  Defendant Officers also argue that Plaintiffs failed to include a state law false arrest claim in their Complaint, but the principle articulated in n.9--torpedoes that contention as well.

22

1998)), though reasonable mistakes will be excused (id). Here it
is undisputed that Noel was arrested, so the only issue to
resolve--outside of personal responsibility--is whether there
was probable cause for Defendant Officers to do so. On that score
Plaintiffs carry the burden of establishing that probable cause
was lacking (McBride v. Grice, 576 F.3d 703, 706 (7th Cir.
2009)(per curiam)).

In their effort to support a finding of probable cause,
Plaintiffs point to the testimony of Noel and Alvarado as to the
time before, during and after Noel's arrest. Despite the fact
that Noel was arrested for assertedly delivering cocaine, Noel's
deposition reflects that he had no items on his person at the
time of his arrest--or immediately preceding his arrest--except
his wallet, his ID and money for a deposit on an apartment.
Alvarado, who was arrested for purportedly accepting cocaine in
exchange for money, testified that he was not outside with Noel
but rather inside his house when Defendant Officers approached
Noel and arrested him. After being arrested, neither man was
taken to the police station immediately--instead they were
questioned in an alley, then driven to two houses associated with
Noel so that searches could be conducted--actions at odds with
the officers' contention that probable cause to arrest the two
men already existed. And remember that what has just been said
is coupled with Defendant Officers claiming shelter by wrapping

23

themselves in the Fifth Amendment in this civil case, with the consequent inference of guilty behavior.

In their responses to Noel's summary judgment motion, Defendant Officers contend that there are countervailing pieces of evidence that undercut Noel's version of events. They first cite to the large amount of money Noel was carrying (on that score, their version of that amount rather than Noel's must be credited in deciding his motion) and the fact that he had smoked a cannabis cigar before walking to Vicky's, returning and being arrested.

But those facts are irrelevant, for Defendant Officers were not aware of them (Kelley, 149 F.3d at 646). Though Defendant Officers make no contention that they knew how much money Noel was carrying when he was stopped, Unnamed Officers do argue that there is no evidence as to whether Defendant Officers did or did not observe Noel smoking a cannabis cigar. That position more than strains credulity--indeed it is flat-out frivolous. There is not a single piece of evidence suggesting that Defendant Officers were observing Noel before he walked to Vicky's, nor was there any mention of cannabis in any of Noel's police reports. It is simply irrelevant to the probable cause calculus. Although Herrera also urges this Court to consider several of Defendant Officers' observations recorded in Noel's arrest reports, it has already been said that those statements are not admissible to

prove the truth of their content.

In summary, without any countervailing evidence a reasonable jury must necessarily find that at the time of his arrest Noel was standing alone outside and did not possess any drugs, yet was arrested for delivering cocaine. Further, the jury would have to consider that the officers present for Noel's arrest invoked their Fifth Amendment rights when asked about that arrest. On all the evidence a reasonable jury would have to conclude that Noel was arrested without probable cause.

Defendant Officers nonetheless contend that Noel cannot sufficiently prove that any particular officer is personally responsible for his arrest. In response Plaintiffs have suggested that Defendant Officers all operated as a team to violate his rights knowingly. There is surely enough evidence for a jury to infer that such a plan existed, but Plaintiffs correctly point out that there is no need for them to prove such a plan. At the very least each Defendant Officer witnessed Noel being arrested without probable cause, questioned in an alley, driven in a squad car around town and jailed, yet no officer intervened. There was ample opportunity for a non-participating Defendant Officer to attempt to talk his or her fellow officers out of the false arrest, to call a supervisor or to call for backup, but there is absolutely no evidence of any such intervention. And again Defendant Officers' blanket use of their

25

Fifth Amendment rights drives another nail into their evidentiary
coffin by eliminating any arguable contention that such
intervention took place.

In sum, Plaintiffs' motion for summary judgment on Noel's
false arrest claim is granted against all Defendant Officers.
This opinion turns then to Noel's other contentions.

**False Imprisonment**

In Complaint Count II Noel asserts a Section 1983 false
imprisonment theory of recovery against Defendant Officers,
maintaining that his imprisonment occurred in violation of the
Fourteenth and Eighth Amendments. To the extent such an argument
differs from Noel's false arrest claim, Unnamed Officers seek to
have it dismissed via summary judgment. Because Plaintiffs have
not responded to that portion of Unnamed Officers' motion, it
would appear that it must be granted (cf. Bowers v. United
States, No. 12-2650, 2012 WL 6622225, at *1 (7th Cir. Dec. 20)).

But even if that were not the case, Wallace v. Kato, 549
U.S. 384, 389-90 (2007) would have prevented Noel's false
imprisonment count from adding anything to his lawsuit. Wallace,
id. at 388 explains that false arrest is actually a subset of the
tort of false imprisonment. Further, the time span of any
recovery for false arrest runs only until a suspect is held
pursuant to legal process, at which point no false imprisonment
claim--false arrest or otherwise--continues to run (id. at 389-

26

90).  Thus Noel's false arrest claim covers all possible false imprisonment damages that he could recover.

## Unlawful Searches

Plaintiffs' Complaint includes two charges of unlawful search: one of Johnson's and Santiago's North Francisco Avenue home (the "Francisco Search") and one of Socorro and Lourdes Padilla's 35th Avenue home (the "35th Avenue Search").  Unnamed Officers have moved for summary judgment as to the Francisco Search, and both Plaintiffs and Unnamed Officers have moved for summary judgment as to the 35th Avenue Search.

It has long been established that warrantless searches are unreasonable under the Fourth Amendment unless (1) exigent circumstances and probable cause exist or (2) consent is given (Reardon v. Wroan, 811 F.2d 1025, 1027-28 (7th Cir. 1987)). Defendant Officers do not argue that either exigent circumstances or probable cause was present, so the only issue is whether Defendant Officers had consent to enter each home.

Consent to search a home can be given by anyone with actual or apparent authority, including a third party with common control over the premises searched (United States v. Melgar, 227 F.3d 1038, 1041 (7th Cir. 2000)).  Whether or not an occupant gave consent to search a home is a totality-of-the-circumstances determination (United States v. Griffin, 530 F.2d 739, 742 (7th Cir. 1976)).  Consent can be given either verbally or nonverbally

27

(<u>United States v. Villegas</u>, 388 F.3d 317, 324 (7th Cir. 2004),
but it must be given voluntarily (<u>Griffin</u>, 530 F.2d at 742).
Involuntariness can result from physical or psychological
coercion or from trickery or deception on the part of the
searching officers (<u>id</u>. at 742-43). As Plaintiffs note, an
occupant can consent to a search of limited scope (<u>United States
v. Dichiarinte</u>, 445 F.2d 126, 129-30 (7th Cir. 1971)), and the
standard for determining the bounds of an occupant's consent is
one of objective reasonableness--that is, what a reasonable
person would understand from the interaction between the occupant
and the searching officers (<u>United States v. Jackson</u>, 598 F.3d
340, 348 (7th Cir. 2010).

As with all civil cases, Plaintiffs bear the ultimate burden
of persuasion on the issue of the claimed absence of consent
(<u>Valance v. Wisel</u>, 110 F.3d 1269, 1278-79 (7th Cir. 1997)). That
said, when Defendant Officers contend that they received consent
to search a residence, they must first carry the burden of
producing some evidence of that consent, due to the general
presumption of the unconstitutionality of warrantless searches
(<u>id</u>.).

As to the Francisco search Defendant Officers have met their
burden of production. In support of their motion Unnamed
Officers point to Johnson's initial consent to their entrance
into the Francisco residence, followed by the absence of any

objection to their presence by either Santiago or Johnson. Further, when Santiago was asked whether Noel had any belongings at the house, Santiago turned to walk toward his nearby clothes, and an officer could believe that was an invitation to follow her. Finally, Santiago eventually told the searching officers not to turn on the lights in her baby's room, suggesting that she was aware of her right to limit the search and that she did so.

There is still, however, a genuine issue of material fact that prevents the grant of Unnamed Officers' summary judgment motion. Johnson did give the searching officers consent for them to enter, but instead of immediately entering the officers spoke with Johnson's co-occupant Santiago. Even if one co-occupant has consented to a search, another co-occupant has the power to prevent that search (see Georgia v. Randolph, 574 U.S. 103, 114-15 (2006)). Santiago did not actually rebuff the officers, but when she questioned them she was allegedly told that if she let the officers in to see Noel's belongings, he would be let go. It is clear that the officers' promise was a falsehood, and a reasonable jury could decide that absent that pressure or trickery Santiago would have objected to the search of her home, trumping any consent by Johnson.

Even assuming the lack of consent, though, Unnamed Officers argue that Plaintiffs could not ascribe any violative conduct to particular officers. That position has already been found

29

wanting in this opinion's earlier discussion. Even though a reasonable jury could find that Plaintiffs have identification problems, the jury could readily also find that, regardless of which officer did what, all Defendant Officers colluded to carry out a plan that involved the deprivation of Plaintiffs' constitutional rights. As before, circumstantial evidence of such a plan includes the fact that at the very least each officer observed a false arrest and thereafter helped transport an illegally held citizen around town as searches were conducted, all without intervening. And once again each Defendant Officer called on the Fifth Amendment in refusing to answer a single question about the incident at issue.

If a jury found--as it surely could--that Defendant Officers were engaged in a knowing attempt to violate each of Plaintiffs' rights, that jury could reasonably conclude that all five Defendant Officers, including those that stayed in the car to guard Noel and Alvarado during the two searches, helped to advance the nefarious plot and thus contributed to the deprivation of each of Plaintiffs' constitutional rights. Unnamed Officers' motions for summary judgment on Johnson's and Santiago's unlawful search contention are therefore denied.

As for the search of Socorro's and Lourdes' home, Defendant Officers have even failed to meet their burden of production. They admit that the searching officers simply announced that they

30

were entering without asking, and as purported evidence of
consent the officers put forth nothing more than Socorro's lack
of an objection (see Z. Resp. ¶63; H. Resp. ¶63).  Absence of an
objection is certainly relevant in determining whether an
occupant provided consent (see United States v. Villegas, 388
F.3d at 325), but it does not assure the legality of a search.

To the contrary, as United States v. Shaibu, 920 F.2d 1423,
1427 (11th Cir. 1990)(internal quotation marks and citation
omitted) has stated:

> [T]he government may not show consent to enter from the
> defendant's failure to object to the entry. To do so
> would be to justify entry by consent and consent by
> entry. This will not do.

Instead something more--even if it is nonverbal--must be present
to show the occupant has consented, as illustrated by the cases
cited by Defendant Officers themselves (see, e.g., Villegas, 388
F.3d at 324-25; United States v. Cotnam, 88 F.3d 487, 495 (7th
Cir. 1996); Griffin, 530 F.2d at 743).  In each of those cases an
occupant said or did something to indicate to the police that
they could enter, if nothing more than opening the door in
response to the police's announcement of office and orally
agreeing to speak with the police (see Villegas, 388 F.3d at 324-
25).  Here by contrast the only question asked of Socorro before
the officers entered was whether Noel lived in her home.  Merely
informing officers that a person does not live with you most
certainly cannot be taken as consent for those officers to enter.

31

Because Socorro took no action and spoke no words that could be taken as consent to search her home, the search was unquestionably unlawful.

What remains is whether Plaintiffs can identify which officers are personally responsible for the unlawful search. Noel identified Herrera and Zogg as two of the three officers that entered Socorro's and Lourdes' apartment building, and all three officers that entered the building also entered Socorro and Lourdes' apartment without consent. Herrera points out that Noel gave Defendant Officers the wrong apartment number and never actually saw the three searching officers enter the apartment, as opposed to the apartment building (H. Resp. ¶62). But give the fact that Socorro was shown Noel's identification card by the searching officers (P. St. Ex. 50, p. 32), no reasonable jury could conclude anything but the fact that Socorro's apartment was searched by three of the Defendant Officers, specifically including Herrera and Zogg. Consequently Socorro's and Lourdes' motion for partial summary judgment on the issue of unlawful search is granted against Herrera and Zogg.

As already discussed, a reasonable jury could decide that all Defendant Officers colluded to deprive Plaintiffs of their constitutional rights. Thus Unnamed Officers' request is denied, but at the same time what has been tendered to this Court does not suffice to support a liability determination against _all_ of

the Defendant Officers as a matter of law under the seminal Pinkerton approach (Pinkerton v. United States, 328 U.S. 640 (1946)) either.  Further, as noted in the earlier identification section, this Court lacks the evidence to rule as a matter of law that it was Del Bosque and not Markiewicz that entered and searched Socorro's and Lourdes' home.

Because the question of liability on the part of the searching officer has already been answered, though, the most efficient course of action is neither to grant nor to deny Plaintiffs' motion on that search claim against Markiewicz and Del Bosque.  Instead this Court will permit Plaintiffs to submit further evidence establishing which of those two officers participated in searching Socorro's and Lourdes' home.  If such evidence can be presented, Plaintiffs' motion on that claim will be granted against the searching officer and denied against the nonsearching officer.  Finally, Plaintiffs' motion on this claim is denied as to Hopkins, though Plaintiffs may still seek to prove at trial that she was part of an agreement to do her part in advancing the illegal search of Socorro's and Lourdes' home.

**Due Process**

Noel advances two theories upon which he bases his due process claim:  First he asserts that Defendant Officers fabricated evidence against him, and second he argues that Defendant Officers committed a Brady violation by failing to

33

reveal their history of official misconduct.  This opinion will
deal with those theories seriatim.

As for the first, Noel contends that he spent a year in
prison due to Defendant Officers' fabrication of evidence against
him, an asserted violation of his right to due process.
Defendant Officers respond that Noel has provided no evidentiary
support for the proposition that they fabricated evidence, adding
that in any event a due process claim based upon the mere
fabrication of evidence, as opposed to its use, is not
cognizable.

This opinion need not discuss the evidentiary support for
Noel's claim of evidence fabrication because that theory is not
cognizable in this Circuit.  There is no question that a due
process violation takes place when fabricated evidence is used at
trial (see Buckley v. Fitzsimmons, 20 F.3d 789, 796 (7th Cir.
1994)), but without a trial no such due process claim exists
(Brooks v. City of Chicago, 564 F.3d 830, 833 (7th Cir. 2009);
McCann v. Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003)).  That
point is made clear by Brooks, an analogous case in which the
plaintiff was arrested (allegedly based upon fabricated
evidence), held for several months and released pursuant to the
dismissal of the charges filed against him.  As Brooks, 564 F.3d
at 833 (internal quotation marks omitted) teaches:

> A plaintiff cannot state a due process claim by
> combining what are essentially claims for false arrest

> under the Fourth Amendment and state law malicious
> prosecution into a sort of hybrid substantive due
> process claim under the Fourteenth Amendment.

That is the precise situation presented to this Court, and so
that theory fails.

Noel seeks to rely on two more recent cases that he says
cast doubt on the holdings in Brooks and McCann: Whitlock v.
Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012) and Alexander v.
McKinney, 692 F.3d 553 (7th Cir. 2012). But Whitlock, 682 F.3d
at 582 explicitly stated that "the alleged constitutional [due
process] violation here was not complete until trial," proving
Defendant Officers' point. As for Alexander, its alleged value
according to Plaintiffs is its acceptance of a Second Circuit
case, Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000). Zahrey, id.
at 348-49 determined that there is a Fourteenth Amendment right
"not to be deprived of liberty as a result of the fabrication of
evidence by a government officer," even when the accused is
eventually acquitted of the charges against him (and thus did not
suffer injury due to a faulty trial). But Alexander did not
accept Zahrey's recognition of an expanded right to due
process--it rather found Zahrey inapposite to the situation
before it. Because Noel's case is indistinguishable from Brooks
and no more recent Seventh Circuit case has called Brooks into
question, Noel's due process claim cannot be predicated upon
Defendant Officers' alleged fabrication of evidence.

35

Noel also claims that Defendant Officers violated his due process rights by failing to meet their Brady obligations--that is, they withheld evidence of their past misconduct. But Brady also establishes a trial right (see Fields v. Wharrie, 672 F.3d 505, 513-14 (7th Cir. 2012); Buckley, 20 F.3d at 797), violated only when the government fails to turn over material evidence in time for a defendant to make use of it at trial (Bielanski v. County of Kane, 550 F.3d 632, 645 (7th Cir. 2008)). This Court has recognized as much before (Johnson v. Garza, 564 F.Supp.2d 845, 854 (N.D. Ill. 2008)). Because Noel never had a trial, the government could not have failed to turn over evidence in time for him to use it (for there was no opportunity for its use), nor could any failure to turn over evidence have been material (for Noel was never tried, much less convicted).

Noel cites two cases (Mosley v. City of Chicago, 614 F.3d 391 (7th Cir. 2010) and Parish v. City of Chicago, 594 F.3d 551, 554 (7th Cir. 2010)) as showing that our Court of Appeals has assertedly left open the possibility that a Brady violation could occur despite a trial resulting in acquittal. But each of those cases, unlike this one, did involve a trial. Whether or not a Brady injury can exist without an actual conviction (the question considered in Mosley and Parish), those cases do not undercut the caselaw referred to in the preceding paragraph of this opinion. Plaintiffs' motion for summary judgment on Noel's due process

36

claim is therefore denied.

## State Law Claims

### Malicious Prosecution

Plaintiffs and Unnamed Officers have filed cross-motions for summary judgment on Noel's state law claim of malicious prosecution. For Noel to succeed on that claim, he must prove these elements (Hurlbert v. Charles, 238 Ill.2d 248, 255, 938 N.E.2d 507, 512 (2010)):

> (1) the defendant commenced or continued an original criminal or civil judicial proceeding; (2) the proceeding terminated in favor of the plaintiff; (3) there was an absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

Malice and damages--the final two elements--were ignored by Defendant Officers and thus are not at issue. Herrera's contention that there was probable cause to arrest Noel refers only to his arguments against Noel's false arrest claim, which this Court has already rejected. Hence the probable cause element is not at issue either. This opinion therefore confines its analysis to the first two elements.

Most of the parties' arguments concern the question whether the nolle prosequi disposition in Noel's case constituted a termination in his favor. Illinois' standard for determining whether a case has been terminated in a defendant's favor is borrowed from the Restatement (Second) of Torts ("Restatement"), which looks to the circumstances of a termination rather than to

37

its form or title (<u>Cult Awareness Network v. Church of Scientology Int'l</u>, 177 Ill.2d 267, 276, 685 N.E. 2d 1347, 1352 (1997)). While nolle prosequi dismissals are considered an abandonment of proceedings by the prosecutor--which pursuant to Restatement §659 should qualify them as a termination in favor of the accused--both Illinois courts and the Restatement require further inquiry to confirm that "the nolle prosequi was entered for reasons consistent with [the accused's] innocence" (<u>Swick v. Liautaud</u>, 169 Ill.2d 504, 513, 662 N.E.2d 1238, 1242 (1996); see also Restatement §§660, 661). It is plaintiff's burden to prove that his criminal proceedings were terminated in his favor (<u>Swick</u>, 169 Ill.2d at 513, 662 N.E.2d at 1243).

In support of his motion Noel cites <u>Adams v. Sussman & Hertzberg Ltd.</u>, 292 Ill.App.3d 30, 42, 684 N.E.2d 935, 953 (1st Dist. 1997), which held that a dismissal is a termination in favor of the accused if it is entered due to a witness' refusal to testify, for a lack of witnesses is indicative of the State's inability to prove its case (see also <u>Petrovic v. City of Chicago</u>, No. 06 C 6111, 2008 WL 4286954, at *9-*10 (N.D. Ill. Sept. 16)). Noel argues that this case is analogous to <u>Adams</u> in that the State lacked credible witnesses and thus could not sustain its burden against him. To that end Noel points to Demacopoulos' testimony that the only known witnesses to Noel's alleged crime--Del Bosque and Herrera--were prevented from

38

testifying because they were under investigation or indictment for crimes similar to the conduct alleged by Noel (see P. St. Exs. 64, 72). Because the State lacked any witnesses with whom to prosecute Noel, Demacopoulos states, Noel's case was dismissed (id.).

Defendant Officers maintain that Noel misreads Demacopoulos' testimony. They cite her statement that the dismissal of Noel's criminal case was not based on a belief that "Mr. Padilla . . . didn't do what [was] alleged in the complaint" (Z. St. Ex. 29 at 14) as suggesting that Noel's dismissal was not indicative of innocence. Defendant Officers also attempt to distinguish Noel's case from Adams by explaining that, unlike the witness in Adams, Herrera was willing to testify against Noel and was simply prevented from doing so through prosecutorial discretion.

Defendant Officers' view is myopic indeed--or perhaps astigmatic may be a more apt metaphor. Demacopoulos was not opining on Noel's innocence vel non--she merely explained that it was a lack of credible witnesses, rather than having to rely on a belief about Noel's innocence, that drove her decision to dismiss Noel's case (P. St. Ex. 64 at 14). Indeed, the very fact that the only witnesses willing to testify had been indicted for falsifying police reports is even more indicative of innocence than a witness' refusal to testify as in Adams. What controls here (as it did in Adams) is that the State lacked any credible

39

evidence to support the criminal charge, and the State's
inability to carry its burden is indicative of innocence.

What remains then is whether any defendants "commenced or
continued" a criminal prosecution against Noel. It is not
necessary for a police officer to have signed a criminal
complaint to satisfy that requirement (Rodgers v. Peoples Gas,
Light & Coke Co., 315 Ill.App.3d 340, 348, 733 N.E.2d 835, 842
(1st Dist. 2000)). As long as the officer played a significant
role in causing the prosecution, he can be held liable (id.). If
for instance a police officer makes a false statement to a
prosecutor about a suspect, that officer can be found to have
caused the accused's criminal prosecution (see Petrovic, 2008 WL
4286954, at *9; cf. Rodgers, 315 Ill.App.3d at 348-49, 733 N.E.2d
at 842).

Here there is no question that two of the five Defendant
Officers commenced or continued Noel's prosecution. As
Demacopoulos' deposition reflected, Noel's prosecutor did not
have any evidence against him other than the observations of his
arresting officers (P. St. Ex. 64 at 14). Those officers surely
meet the standard explained in the preceding paragraph: Herrera
not only signed, and therefore attested to the accuracy of, the
police reports stating that Noel delivered cocaine, but he also
signed the criminal complaint against Noel and attempted to serve
as a witness at Noel's criminal trial, while Del Bosque signed

two of those police reports as well (P. St. Exs. 7-8).[11]

In short, those two officers supplied the only evidence on which the prosecutors relied in deciding to commence and continue Noel's prosecution, so that they may be said to have commenced or continued that prosecution in the caselaw sense. Noel's motion for summary judgment on his malicious prosecution claim is therefore granted against Del Bosque and Herrera.

Plaintiffs have failed to provide any evidence that Hopkins, Markiewicz or Zogg made statements or took actions that led to Noel's criminal prosecution. Their names are on Noel's arrest reports, but they did not sign those arrest reports and thus did not attest to the accuracy of the content contained therein. So Hopkins', Markiewicz' and Zogg's motions to dismiss Noel's claim of malicious prosecution are granted.

## Intentional Infliction of Emotional Distress

Unnamed Officers have asked this Court to dismiss Noel's state law claim of intentional infliction of emotional distress.[12]

---

[11] Even though Plaintiffs correctly point out that Zogg signed a police report stating that he found money at the scene of Noel's arrest (P. St. Ex. 11), Demacopoulos testified that the State's Attorney's Office knew of only two witnesses to Noel's alleged crime: Herrera and Del Bosque. Thus no statement attributable to Zogg could have caused the prosecutors to continue Noel's criminal prosecution.

[12] While the Complaint here suggests that all Plaintiffs experienced severe emotional distress, and Unnamed Officers' motion seeks to dismiss that claim as to all Plaintiffs, Plaintiffs' response to Unnamed Officers' summary judgment motion speaks only to Noel's claim. Accordingly all emotional distress

41

To succeed on that claim Noel must prove three elements: (1) that Defendant Officers engaged in extreme and outrageous conduct, (2) that Defendant Officers were aware that their conduct had a "high probability" of causing severe and extreme emotional distress and (3) that Defendant Officers conduct did, in fact, cause such distress (<u>Stokes v. Bd. of Educ. of the City of Chicago</u>, 599 F.3d 617, 626 (7th Cir. 2010)).

Unnamed Officers advance three arguments for the issuance of summary judgment on that count. First they urge that there is no proof of extreme or outrageous conduct. Even if this Court disagrees, however, they maintain that Noel cannot ascribe any particular action to an individual defendant. And finally, Unnamed Officers contend that Noel has not provided enough proof of his prior mental state to meet Illinois' standard for emotional distress.

As already noted, Noel has tendered enough evidence for a reasonable jury to determine that the Unnamed Officers knowingly arrested him without probable cause, transported him around town and brought him to jail, where he stayed for eight months. Conduct of that nature would be enough to lead an average member of the community to exclaim, "Outrageous!" (see Treece v. Village of Naperville, 903 F.Supp. 1251, 1260 (N.D. Ill. 1995), quoting the Illinois Supreme Court's approach to that standard),

---

 claims other than Noel's are dismissed.

42

especially given that the Unnamed Officers were abusing their
power if they did indeed engage in that conduct (McGrath v.
Fahey, 126 Ill. 2d 78, 87, 533 N.E.2d 806, 810 (1988)).
Moreover, this opinion has already concluded that a jury could
reasonably conclude that Defendant Officers all knowingly worked
together to arrest Noel falsely and bring him to jail, and that
in turn makes it entirely reasonable for all Defendant Officers
to have been aware that their conduct would very likely lead to
Noel's experiencing extreme emotional distress.

What remains, then, is whether there is enough evidence for
a jury to conclude reasonably that Noel actually suffered severe
and emotional distress. In Illinois emotional distress is severe
enough for recovery when "no reasonable man could be expected to
endure it" (Public Fin. Corp. v. Davis, 66 Ill. 2d 85, 90, 360
N.E. 2d 765, 767 (1976), quoting Restatement §46 cmt. d (1965)).
For that purpose both the intensity and duration of a plaintiff's
distress must be considered (id.), and the extreme and outrageous
character of conduct can itself serve as evidence that distress
existed (Doe v. Calumet City, 161 Ill. 2d 374, 396, 641 N.E. 2d
498, 508 (1994). Nonetheless Adams, 292 Ill.App. 3d at 38, 684
N.E.2d at 941-42 teaches that "the infliction of such emotional
distress as fright, horror, grief, shame, humiliation and worry
is not sufficient to give rise to a cause of action."

While Noel's reports of anxiety, depression, helplessness,

frustration, impatience and sadness while incarcerated may not alone clear the hurdle erected by the caselaw, he also testified to having experienced physical symptoms such as panic attacks and "rushes" as a result of his distress. That degree of distress is one that no reasonable person should be expected to withstand, particularly given its duration--for he was incarcerated for nearly a year and continued to experience panic attacks even after he was released.

Unnamed Officers claim that Noel's symptoms were not severe enough to warrant recovery under Illinois law, but they do not cite a single case for that proposition.[13]  They also complain of Noel's failure to seek medical attention or provide medical evidence.  While that failure may appropriately be used in an effort to convince a jury that his distress was less severe than he claims, Unnamed Officers fail to cite to any caselaw suggesting that medical evidence must be presented for a plaintiff to recover on an emotional distress claim.  In fact such evidence is not essential (see Bristow v. Drake Street Inc., 41 F.3d 345, 350 (7th Cir. 1994)).  This Court therefore denies Unnamed Officers' motion for summary judgment on Noel's

---

[13]  There is considerable irony in the spectacle of rogue police officers--persons such as the SOS group who have abused their power and disgraced the uniforms they should have worn with pride--urging that the impact of their outrageous misconduct on their victims was not serious enough to make them bear responsibility for the harm that they caused.

Intentional Infliction of Emotional Distress claim.

### Conclusion

For the reasons stated above, (1) all of Unnamed Defendants' motions for summary judgment are granted as to Noel's false imprisonment claim (2) Markiewicz's, Hopkins' and Zogg's motions for summary judgment on Noel's malicious prosecution claim are granted and (3) the remaining portions of Unnamed Officers' motions for summary judgment are denied. Plaintiffs' motion is granted against all Defendant Officers on Noel's Section 1983 and Illinois false arrest claims, against Herrera on Socorro and Lourdes' unlawful search claim and against Herrera and Del Bosque on Noel's malicious prosecution claim. All remaining portions of Plaintiffs' motion for partial summary judgment are denied.

_____
Milton I. Shadur
Senior United States District Judge

Date:  March 26, 2013